# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Bank of America, N.A. v. Freed**, 2012 IL App (1st) 113178

---

| | |
|---|---|
| Appellate Court Caption | BANK OF AMERCIA, N.A., a National Banking Association, Successor By Merger to LaSalle Bank National Association, as Agent for Lenders, Plaintiff-Appellee, v. LAURANCE H. FREED and DDL LLC, an Illinois Limited Liability Company, Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-11-3178 |
| Filed | March 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from an order entered in the foreclosure of property in Chicago referred to as "Block 37," the trial court's finding that defendants were in contempt for dissipating assets in violation of the citation to discover assets plaintiff served on defendants was not against the manifest weight of the evidence and the trial court did not abuse its discretion in appointing a receiver to inquire about defendants' income and assets and to collect indebtedness due plaintiff and take possession, sell or dispose of any other property; however, the order appointing a receiver was not valid to the extent the receiver was given the discretion to determine whether and when defendants may be purged of contempt, and therefore, the cause was remanded for inclusion of a proper purge provision. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-39930; the Hon. Margaret Brennan, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Bernstein Law Firm, of Chicago (Louis D. Bernstein, of counsel), and Day & Robert, P.C., of Naperville (Scott M. Day, of counsel), for appellants. |
| | Seyfarth Shaw LLP, of Chicago (John H. Anderson and Jerome F. Buch, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE QUINN delivered the judgment of the court, with opinion. |
| | Justices Cunningham and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendants, Laurance H. Freed and DDL LLC, appeal from an order of the circuit court holding them in civil contempt for transferring almost $5 million in violation of citations to discover assets served on them by plaintiff, Bank of America, N.A. (Bank), to enforce a $110,956,772 judgment and from an order appointing a receiver as a remedy for the finding of contempt. On appeal, defendants contend that the trial court's finding of contempt was against the manifest weight of the evidence and that, even if they were in contempt, the trial court's order appointing a receiver as a sanction is invalid because: (1) it provides no viable means of purging the contempt; (2) it impermissibly punishes defendants for their past conduct; and (3) the investigatory authority granted to the receiver is not permitted under section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402 (West 2008)) or Illinois Supreme Court Rule 277 (eff. July 1, 1982). For the reasons set forth below, we affirm the finding of contempt and affirm the order appointing a receiver but reverse that part of the order addressing purge and remand to the trial court so that it may enter a proper purge provision.

¶ 2                                I. BACKGROUND

¶ 3    This case arises out of the foreclosure of a mortgage on commercial property located at 108 North State Street in Chicago, Illinois, commonly referred to as "Block 37." The history of the development of this property is long, but only a brief summary is needed to address the issues raised in this appeal. Block 37 had been vacant for more than a decade when the City of Chicago (City) sold it in 2005 to Mills Corporation (Mills), a Virginia-based real estate investment company. Pursuant to an agreement between Mills and the City, the property was to be developed into a shopping, dining, and entertainment destination and a

-2-

new subway station was to be built underneath. Mills ran into financial problems and sold the property in 2007 to Joseph Freed and Associates, LLC (JFA), a Chicago-based real estate developer. On or about March 22, 2007, JFA entered into a construction loan agreement with LaSalle Bank, N.A., (Bank),[1] with a maximum principal amount of $205 million. JFA's president, Laurance H. Freed, and JFA's parent company, DDL LLC, guaranteed the loan.

¶ 4　　　The loan agreement required that the loan be "in balance" at all times, meaning that the funds available under the loan had to equal or exceed the amount budgeted to complete the project. The loan was not in balance almost immediately after JFA acquired the property and determined that an additional $26 million would be needed to improve and change the physical space. JFA and the Bank tried but were unable to agree to a loan modification and instead entered into a series of separate letter agreements between March 2008 and August 2009, whereby the Bank continued to disburse funds despite the default. However, in October 2009, after the Bank and JFA could not agree on a plan to add a movie theater to the mall, which would have required additional funding, the Bank filed a foreclosure action in the circuit court of Cook County against defendants as guarantors of the mortgage. The Bank also filed an emergency petition for the appointment of a receiver, which the trial court granted. Defendants filed an interlocutory appeal of that order, and this court filed an opinion affirming the trial court (*Bank of America, N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158 (2010), *appeal denied*, 237 Ill. 2d 552 (2010)). On December 22, 2010, the trial court entered judgment against defendants in the amount of $206,700,222.39 pursuant to their guaranty of the loan. A foreclosure sale was confirmed on April 26, 2011, and the amount bid reduced the judgment to $110,956,772.20.

¶ 5　　　On January 3, 2011, the Bank served citations to discover assets on both Freed and DDL. The citations included the following standard provision:

　　　"You are prohibited from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further notice of court or termination of the proceedings. You are not required to withhold payment of any money beyond double the amount of judgment."

¶ 6　　　On June 9, 2011, the Bank filed a motion for rule to show cause pursuant to section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402 (West 2008)) (Code) and Illinois Supreme Court Rule 277 (eff. July 1, 1982), alleging that defendants had dissipated almost $5 million in assets in violation of the citations served on them. The trial court granted the Bank's motion and held an evidentiary hearing on the rule to show cause on August 26, 2011.

¶ 7　　　Prior to the commencement of the hearing, the trial court granted defendants' motion *in limine* to bar any testimony regarding their compliance with the disclosure requirements

---

[1]Plaintiff, Bank of America, N.A., is the successor trustee by virtue of an October 2008 merger with LaSalle Bank, N.A.

under the citations and to limit the hearing to testimony regarding dissipation of assets. The Bank's first witness at the hearing was Nancy Ross, a financial consultant retained by the Bank to review documents produced by the defendants and other evidence to determine if defendants had transferred assets after receiving the citations. Ross testified that Freed's checking account showed that $245,000 was transferred out of a Deustsche Bank account to DDL and Danlar, LLC, an investment holding company owned by Freed and his brother, and that $193,739.64 was transferred out of a DDL Harris Bank account, leaving $98,667.01 remaining when the account was subsequently closed. Ross also testified that the check registers for Freed and DDL showed numerous "book entries," which are transfers of funds that belonged to or were owed to Freed or DDL, such as Freed's salary, tax refunds, and investment income, but which were not actually deposited into defendants' accounts but instead went to other entities, such as Danlar, DDL, and other Freed-owned limited liability companies (LLCs). Although this money never transferred through defendants' accounts, the JFA accounting department noted these transactions in check registers to account for defendants' assets and to have a record of where the assets went. Ross said that Freed would then use the funds that were transferred to other entities to pay a variety of obligations, such as the JFA payroll, mortgage payments, and defendants' attorney fees. Ross opined that Freed was using Danlar as a depository for his cash assets and that the accounting records show that money that belonged to DDL was being transferred to various LLCs. Ross testified that Freed's check register indicates that $1,028,226 was transferred out of his account after the citations were issued, with $7,748.23 going to Bank of America, and that DDL's check register shows transfers totaling $3,946,606.72 after the citations were issued. Ross further stated that these transfers did not create value for the Bank.

¶ 8        Next, Caroline Walters testified that she oversees the accounting department at JFA. She said that the accounting department prepares bank reconciliations, which show all money booked through a particular entity and are used to ensure that all entries are correct. Walters testified that she received copies of the citations but did not discuss them with Freed and was never told by Freed that the citations prevented any transfers of his or DDL's assets. She said that she thought the citations pertained to the collection of documents. Walters acknowledged that Freed's Deutsche Bank bank statement showed a transfer of $245,000 to a Danlar account at Northern Trust Bank and that the bank statement for DDL's account at Harris Bank notes transfers totaling $193,739.64 to various entities. She testified that she was never told not to make those transfers.

¶ 9        Pamela Bazan testified that she is a corporate controller at JFA and also handles Freed's personal accounting. She stated that she had been shown a copy of the citations but was never told that they prohibited transfers of Freed's or DDL's assets and that she did not change how she handled Freed's or DDL's business after the citations were served. She acknowledged that after receiving the citations, $245,000 was transferred from Freed's Deutsche Bank account and into Danlar's Northern Trust account and that even though the money never went into Freed's bank account, she made a book entry showing that it did. She also acknowledged the transfer of $193,739.64 from DDL's account at Harris Bank after the citations were received.

¶ 10       Defendant Freed testified on his own behalf, stating that he discussed the citations with

JFA's attorney, Jeff Arnold, and delegated to Arnold the task of discussing them with the accounting department staff. During a deposition, Freed stated that he did not discuss with JFA's accounting staff whether DDL could make any payments in light of the citations and that he took no steps to make sure that DDL did not make any payments.

¶ 11 Defendants also called Ryan Pistarik as a witness. Pistarik, a forensic accountant, was retained by defendants to review 43 book entry transactions that the Bank claimed were a violation of the terms of the citations. Pistarik opined that none of the cash related to those transactions came from either DDL's or Freed's bank statements and that none of the transfers involved cash being disbursed from DDL to a DDL subsidiary. Instead, Pistarik said, these transactions involved cash going from one DDL subsidiary to another DDL subsidiary, neither of which was subject to the citations, and that those transfers did not affect the DDL balance sheet. Pistarik said that the JFA accounting department could have recorded the transactions as loans, but that the book entry method was easier. On cross-examination, Pistarik acknowledged that he was only given a select group of book entry transactions to review and did not review any cash transfers by DDL or Freed. Pistarik also acknowledged that some of the transfers were used to pay defendants' obligations, such as attorney fees, JFA payroll, and loans.

¶ 12 On October 5, 2011, the trial court entered an order finding defendants in contempt. The court noted that Freed acknowledged receipt of the citations and that he understood that they prevented him from transferring his or DDL's assets but that he took no action to prevent such transfers by informing JFA's accounting staff. The trial court found, based on the testimony and records submitted, that $1,020,377.81 had been transferred from Freed's accounts and $3,946,606.72 had been transferred from DDL's accounts after the citations had been served. Therefore, the court found that the Bank sustained its burden of proving by a preponderance of the evidence that defendants violated the citations to discover assets.

¶ 13 The court then addressed whether defendants had acted willfully and contumaciously. The court acknowledged defendants' argument that the transfers were made to fulfill obligations under the operating agreements for the LLCs or to preserve the value of assets but found that the transfers violated the citations, which prohibited defendants "from making payments, including payments of ordinary business expenses." The court noted that defendants did not rebut the testimony of the Bank's expert, Nancy Ross, who testified that the transfers by Freed and DDL did not create value for the Bank. The court also found that Freed is not unsophisticated, that he has an ownership interest in numerous LLCs, is a real estate developer, and has prior experience with citations. However, the court noted, "[w]hen served with the citations at issue here, the evidence is clear that he did not address the need to prevent the dissipation of assets with those responsible for doing the accounting and paying the bills, namely Pamela Bazan and Caroline Waters [*sic*]. This failure to act is clearly willful and contumacious."

¶ 14 Turning to the issue of a sanction, the court found that appointing a receiver was a proper remedy, stating:

> "The power to appoint a receiver lies strictly in the discretion of the court. *Prassas v. Nicholas W. Prassas & Co.*, 102 Ill. App. 3d 319, 321 (1st Dist. 1981). The

appointment of a receiver is 'appropriate only when dissension, fraud, misconduct or mismanagement exist *** [and] that the dissension or misconduct *** created a danger that the property be placed beyond the jurisdiction of the court.' *Prassas*, 102 Ill. App. 3d at 321. In the present case, Freed's own counsel argues that the money has been transferred and cannot be recovered and therefore there is no remedy. Clearly then the only appropriate remedy is the appointment of a receiver to collect any indebtedness or to take possession, sell or otherwise dispose of any other property."

¶ 15    On October 24, 2011, the trial court entered an order appointing Donald A. Shapiro as receiver and granting him the following powers:

"(a) The Receiver shall have the power and authority to make all inquiries of Freed, DDL and third parties about income and assets of Freed and DDL and transfers thereof, including assets held on behalf of Freed and DDL by related entities and affiliates.

(b) Freed and DDL shall cooperate with the Receiver by making available for inspection and copying by the Receiver as soon as reasonably possible, all of their financial records, including those relating to their assets and transfers of their assets, wherever located and however held, for the period beginning January 3, 2009, both in hard copy and in electronic form, including access to all computer software and hardware containing Freed's and DDL's financial information.

(c) The Receiver shall have the power and authority to collect any indebtedness due to and to take possession, sell or otherwise dispose of any other property of Freed and DDL, as from time to time provided by order of this Court.

(d) The Receiver shall have such other powers and authority as are reasonably incident to the powers and authority set forth above, and such other powers and authority as are from time to time granted by the Court."

¶ 16    The order also contained a "purge" provision explaining how defendants could rid themselves of the contempt and discharge the receiver. That provision stated as follows:

"The contempt shall be purged and the Receiver discharged when to the Court's satisfaction, (a) Freed and DDL have cooperated in the Receiver's investigation of their assets and transfers of their assets and the Receiver reports to the Court that his investigation is complete, (b) the Receiver makes recommendations to the Court on the method for the collection, sale and disposition of the Freed and DDL assets, and Freed and DDL cooperate with the Receiver in connection with such collection, sale and disposition and (c) the Freed and DDL assets are collected and disposed of and the cash applied toward the judgment entered against Freed and DDL."

¶ 17    Defendants moved to stay the Bank's efforts to enforce its judgment under Illinois Supreme Court Rule 305(b) (eff. July 1, 2004)). This court denied that motion on November 16, 2011, and this appeal followed.[2]

---

[2]Meanwhile on October 24, 2011, the Bank obtained charging orders pursuant to section 30-20(a) of the Limited Liability Company Act (805 ILCS 180/30-20(a) (West 2006)), against approximately 60 limited liability companies in which Freed or DDL has an interest. These charging

## II. ANALYSIS

### A. Order Finding Defendants in Contempt

On appeal, defendants first argue that the trial court erred in finding them in contempt for dissipating assets in violation of the terms of the citations to discover assets. "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 41 (2010). "Contempt that occurs outside the presence of the trial court is classified as indirect contempt." *Id.* "The existence of an order of the trial court and proof of willful disobedience of that order is essential to any finding of indirect civil contempt." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). "The burden initially falls on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. [Citation.] The burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful or contumacious and that he or she had a valid excuse for failure to follow the court order." *Marriage of Charous*, 368 Ill. App. 3d at 107-08. "Whether a party is guilty of indirect civil contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *Cetera*, 404 Ill. App. 3d at 41 (citing *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984)).

The trial court's authority to hold a party in contempt for violating the terms of a citation to discover assets derives from section 2-1402(f)(1) of the Code, which provides, in part:

> "[A] citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, a deduction order or garnishment, belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. *** The court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." 735 ILCS 5/2-1402(f)(1) West 2008).

Further, Illinois Supreme Court Rule 277(h), regarding supplementary proceedings, also addresses contempt as a sanction for violating the terms of a citation, providing, in relevant part, that "Any person who fails to obey a citation, subpoena, or order or other direction of the court issued pursuant to any provision of this rule may be punished for contempt." Ill. S. Ct. R. 277(h) (eff. July 1, 1982). Therefore, it is clear that the trial judge had authority to hold the defendants in contempt if she found that they had failed to comply with the citations.

---

orders, in short, impose a lien on the LLCs' distributional interests in favor of the Bank for payment of the foreclosure judgment.

¶ 23    Defendants contend, however, that the trial court's finding that they transferred assets in violation of the terms of the citations was against the manifest weight of the evidence and should be reversed. Defendants acknowledge that they transferred some funds, as evidenced by the check registers and bank statements produced at the hearing, but assert that all of the transfers were fully documented and disclosed, and that they were not "hiding the ball" as the trial court suggested. They also contend that the funds that were transferred belonged to JFA and DDL subsidiaries, which were not subject to the terms of the citations. Further, defendants argue that the funds were used to fulfill contractual obligations JFA had to the various LLCs that they owned and therefore, did not result in any lost economic benefit to the Bank and indeed actually preserved the value of certain assets, such as their real estate interests.

¶ 24    In the instant case, the evidence presented to the trial court, including Freed's own admissions, overwhelmingly supports a finding that defendants transferred assets in violation of the citations' restrictions. Therefore, we conclude that the trial court did not abuse its discretion in finding defendants in contempt. First, the testimony at the hearing makes clear that Freed did not inform Caroline Walters, the head of JFA's accounting department, or Pamela Bazan, JFA's controller and Freed's personal accountant, that the citations prohibited them from transferring funds belonging to Freed or DDL. Both Walters and Bazan were under the impression that the citations only required them to gather documents. Secondly, a review of the testimony of Nancy Ross along with the documentary evidence shows that funds of both Freed and DDL were transferred after the date the citations were issued. Indeed, defendants acknowledge that $245,000 was transferred from Freed's Deutsche Bank account into a Northern Trust account belonging to Danlar and that $193,739.64 was transferred out of a DDL account at Harris Bank. The Harris Bank account, containing more than $90,000 was subsequently closed and the money was not accounted for. Those transfers, which defendants acknowledge were made, alone violate the restrictive provisions of the citations. The record also shows numerous "book entries" totaling nearly $5 million in assets that belonged to defendants but were transferred to other entities and used by defendants to pay various obligations. Since these were assets belonging to the defendants or to which the defendants may be entitled or which may be acquired by or become due to them, those transfers were made in violation of the terms of the citations.

¶ 25    As for defendants' argument that these funds were used to preserve the value of their interests in several real estate entities, the evidence shows that the money was used for several purposes, including JFA's payroll obligations, defendants' attorney fees, and to make payments on a loan on Freed's personal airplane. Further, once the judgment was entered in the Bank's favor and the citations were issued prohibiting defendants from transferring any assets, the authority to make decisions about how best to preserve assets belonged to the Bank, not the defendants. However, defendants decided to circumvent the citations by having cash that was owed to them paid to other entities that they owned, which were not subject to the citations. Those entities held the money and permitted defendants to disburse it as they chose. These actions violated the terms of the citations, which prevented transfers of assets to which the judgment debtor may be entitled and are grounds for holding defendants in contempt.

¶ 26    Even accepting defendants' argument that these transfers were made in the course of JFA's business and to adhere to obligations of JFA and other LLCs, such transfers are in violation of section 2-1402(f)(1), which does not provide an exception for transfers made "in the ordinary course of business." *City of Chicago v. Air Auto Leasing Co.*, 297 Ill. App. 3d 873, 879 (1998) (holding that transfers made for a "proper corporate purpose" violated section 2-1402). Therefore, we hold that the trial court's finding that defendants were in contempt for dissipating assets in violation of the terms of citations to discover assets was not against the manifest weight of the evidence or an abuse of discretion.

¶ 27                              B. Order Appointing a Receiver

¶ 28    Next, defendants contend that the trial court abused its discretion by appointing a receiver as a sanction for their civil contempt. Defendants raise three arguments to support their contention that the trial court's order appointing a receiver must be reversed: (1) it improperly punishes past conduct; (2) it is a remedy not authorized by any Illinois statute or case law; and (3) it is invalid because it does not provide a viable means for them to purge their contempt as required under Illinois law.

¶ 29                              1. Punishing Past Conduct

¶ 30    Defendants contend that the trial court's order appointing a receiver improperly punishes them for past conduct and must be reversed. For support, defendants rely on *Jackson v. Metropolitan Funeral System Ass'n*, 268 Ill. App. 302 (1932), which held that "[c]ourts do not appoint receivers as a punishment for past dereliction, nor because of past dangers. Receivers are appointed because of present conditions and well founded apprehensions as to the future." (Internal quotation marks omitted.) *Id*. at 310. However, the court also stated that "[p]ast conduct and past conditions may be taken into consideration in determining what the present situation is and the future will be, but a receiver will not be appointed because of the things done or attempted at a past time, when the present situation and the prospects for the future are not such as to warrant taking the control of the property out of the hands of its owners." (Internal quotation marks omitted.) *Id*. Therefore, although past conduct cannot be punished by the appointment of a receiver, it can be taken into consideration in determining how best to prevent future misconduct.

¶ 31    Defendants argue that in this case when the trial court appointed the contempt receiver, charging orders had been issued against more than 60 LLCs in which Freed has an interest. As a result, defendants contend, there were no assets to assign to the contempt receiver, and therefore, the only reason the trial court appointed him must have been to punish them for their past behavior. Defendants further assert that if the receiver was appointed to determine if defendants are currently hiding assets, that issue was not properly before the court, as pursuant to the motion *in limine* they filed prior to the hearing, only their dissipation of assets was at issue.

¶ 32    While it is true, as defendants argue, that the trial court considered defendants' failure to comply with the terms of the citations by transferring funds in appointing a receiver, it

appears that the court used that evidence to conclude that defendants may continue to ignore the citations in the future. Defendants transferred almost $5 million through various LLCs in violation of the citations, giving the court reason to be concerned that they would continue to do so in the future if some oversight was not provided. Therefore, we find that the fact that the trial court looked to defendants' past conduct alone is not grounds for a finding that the court abused its discretion in appointing a receiver.

¶ 33                    2. Statutory Authority to Appoint an Investigatory Receiver

¶ 34    Defendants next contend that the appointment of a receiver and granting him authority to investigate and find unknown assets of a defendant as punishment for failure to comply with a citation order is not authorized by section 2-1402 of the Code (735 ILCS 5/2-1402 (West 2008)) or Supreme Court Rule 277 (Ill. S. Ct. R. 277 (eff. July 1, 1982)). Defendants acknowledge that in supplementary proceedings under section 2-1402, a judgment debtor may subpoena or examine third parties in order to find assets or income to satisfy a judgment, but they contend that in this case, by giving the receiver broad and unlimited investigatory authority the court has, in effect, made the receiver a party to the action to work exclusively on the Bank's behalf to uncover assets that are not known to exist. Defendants assert that since the trial court had no statutory authority to appoint a receiver and grant him such broad authority, the order must be reversed.

¶ 35    The Bank contends, however, that the remedy applied by the trial court, namely, the appointment of a receiver to aid in the collection of a judgment, is expressly provided for in Illinois Code of Civil Procedure. First, the Bank notes that section 2-1402(c)(4) of the Code provides, in part, that "[w]hen assets or income of the judgment debtor not exempt from satisfaction of a judgment *** are discovered, the court may, by appropriate order or judgment ***[,] [e]nter any order upon or judgment against the person cited that could be entered in any garnishment proceeding." 735 ILCS 5/2-1402(c)(4) (West 2006). Further, the Bank asserts that section 12-718 of the Code regarding garnishment expressly provides for the appointment of a receiver, stating, in part, as follows:

"The court, when necessary to further the purposes and provisions of Part 7 of Article XII of this Act, may compel the judgment debtor to do or to refrain from doing any specific act or deed; or the court may appoint a receiver to collect any indebtedness or to take possession, sell or otherwise dispose of any other property, and enter all orders in regard thereto which are necessary and equitable between the parties." 735 ILCS 5/12-718 (West 2008).

¶ 36    The Bank argues that because defendants circumvented the restrictions in the citations, it was "necessary and equitable" to appoint a receiver to collect on the indebtedness.

¶ 37    Further, relying on *In re Marriage of Hilkovitch*, 124 Ill. App. 3d 401 (1984), the Bank argues that this court has upheld the appointment of a receiver to aid in the collection and enforcement of a judgment where a defendant has willfully violated a court order. *Hilkovitch* was a divorce proceeding in which the trial court appointed a sequestrator to manage and sell assets of the defendant husband after he refused to pay $12,396 in court-ordered maintenance

-10-

and child support. The husband appealed that decision and the appellate court affirmed, noting that "a sequestrator is a person appointed by the court to take 'into custody of the law *** the real and personal estate (or rents, issues and profits) of a defendant who is in contempt and holding the same until he shall comply.' (Black's Law Dictionary 1531 (rev. 4th ed. 1968).)" *Hilkovitch*, 124 Ill. App. 3d at 423. The appellate court found that the husband's "failure to comply with the court's order, his being found in contempt, and his persistent claim that his income is less than one-third the amount determined by the trial court and affirmed on appeal, all provided justification for the appointment of a sequestrator to seize his property and thereby enforce the provisions of the judgment of dissolution." *Id.* at 424. Further, the court noted that a sequestrator "has been held to have the very powers authorized in the instant case–to seize and manage or sell assets awarded in a judgment to satisfy nonpayment of monies awarded in a judgment of dissolution." *Id*. at 423.

¶ 38　　The Bank also cites several cases from other jurisdictions in which a court has appointed a receiver to collect assets where the debtor has refused to cooperate or comply with trial court orders. For instance, in *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202 (N.Y. 2010), the New York Court of Appeals affirmed the appointment of a receiver in an action brought by a lender to enforce a guaranty on a loan in light of "the complexity of defendants' intangible ownership interests in various limited liability companies and defendant's disregard for [the trial court's] discovery orders (with respect to their finances)." *Hotel 71*, 926 N.E.2d at 1212. The Bank argues that as in *Hilkovitch*, *Hotel 71* and similar cases, because defendants have refused to comply with the trial court's citation order, the court had authority to appoint a receiver and give him authority to collect and enforce the judgment.

¶ 39　　Defendants correctly assert that *Hilkovitch* can be distinguished from the instant case in that the appointment of a receiver under section 2-1402 and the appointment of a sequestrator are not the same remedy, and that the other cases cited by the Bank are not binding on this court. It is also true that none of the cases cited by the Bank hold that the appointment of a receiver to investigate a defendant is an appropriate remedy for contempt. However, section 12-718 of the Code permits the appointment of a receiver to "compel the judgment debtor to do or to refrain from doing any specific act or deed[,] *** collect any indebtedness or to take possession, sell or otherwise dispose of any other property, and enter all orders in regard thereto which are necessary and equitable between the parties." 735 ILCS 5/12-718 (West 2008). Here, in light of its finding that defendants had taken no steps to ensure that JFA employees were abiding by the terms of the citations and had permitted nearly $5 million to be transferred to various entities in direct contradiction to the restrictions in the citations, the trial court entered an order granting the receiver authority to make inquiries of Freed, DDL and third parties about defendants' income and assets and requiring defendants to permit the receiver to inspect all of their financial records, including those relating to their assets and transfers of their assets. Although this grant of authority may be broader than the authority granted to the receiver in the cases cited by the Bank, it is not beyond the scope of authority permitted by section 12-718 of the Code. Therefore, we find that the trial court did not abuse its discretion in appointing a receiver to make inquiries of Freed, DDL and third parties about income and assets and to collect any indebtedness due to the Bank and to take possession, sell or otherwise dispose of any other property.

¶ 40                                3. Contempt Order's Purge Provision

¶ 41        Lastly, defendants argue that the order appointing a receiver is improper because it fails
to provide them a viable means of purging their contempt. Although the Bank asserts that
defendants forfeited this issue by failing to raise the inadequacy of the order when it was
entered, the record shows that defendants did object to the appointment of a receiver during
the October 24, 2011 hearing, stating, in part, "We don't believe that the court has authority
under contempt–indirect civil contempt, to order, in addition, this particular receiver. For that
reason, we can't suggest to the court any language. We think this is a punishment for indirect
civil contempt, and we don't think that's within the court's authority." Therefore, we find
that defendants' general objection to the appointment of a receiver preserved this issue for
appeal.

¶ 42        As noted above, civil contempt proceedings are designed to compel obedience to a court
order. *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007). A valid contempt order must contain a
purge provision, which lifts the sanction when the contemnor complies with the order. *Id*.
A civil contempt order that fails to provide the contemnor with the "keys to his cell" is void.
*Pancotto v. Mayes*, 304 Ill. App. 3d 108, 112 (1999).

¶ 43        In this case, the trial court's order provides that the sanction will be discharged only if,
to the court's satisfaction: (1) defendants have cooperated in the receiver's investigation and
the receiver reports that his investigation is complete, (2) the receiver makes a
recommendation to the court on the collection, sale and distribution of defendants' assets,
and defendants cooperate in such collection, sale, and distribution; and (3) defendants' assets
are collected and sold and the cash applied toward the judgment.

¶ 44        The Bank contends that pursuant to the court's order, the defendants can purge the
contempt by cooperating with the receiver in identifying their assets and applying them to
payment of the judgment, which is what they were required to do in the first place. However,
the second part of that provision requires that the receiver must report to the court that his
investigation is complete. Further, the second requirement is that the receiver makes a
recommendation to the court regarding the collection, sale and distribution of defendants'
assets. These provisions appear to take the keys out of the defendants' hands and give them
to the receiver, for even if defendants cooperate with the receiver, the contempt will not be
purged until the receiver determines that his investigation is complete and makes a report and
recommendation to the court. The Bank does not cite and our research has failed to uncover
any case law supporting a finding that a trial court may appoint a receiver to investigate and
search for assets without limit until the receiver decides that his investigation is complete.
Therefore, we find that because the trial court's order appointing a receiver leaves it up to
the receiver's discretion as to whether and when the sanction may be lifted, the trial court's
order appointing a receiver is not valid. However, the order can be amended to include a
proper purge provision; therefore, although the order is reversed, the case is remanded to the
trial court for further proceedings.

¶ 45                         III. CONCLUSION

¶ 46        For the foregoing reasons, we affirm the finding of contempt and affirm the order
appointing a receiver but reverse the portion of the order addressing purge and remand to the
trial court for inclusion of a proper purge provision.


¶ 47        Affirmed in part and reversed in part; cause remanded.